# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CHRISTOPHER BROGAN,** | : | **CIVIL ACTION** |
| **on behalf of himself and all others** | : | |
| **similarly situated,** | : | |
| *Plaintiff,* | : | |
| **v.** | : | **No. 17-5628** |
| | : | |
| **FRED BEANS MOTORS** | : | |
| **OF DOYLESTOWN, INC.,** | : | |
| *Defendant.* | : | |

## MEMORANDUM

## I.      Introduction

This case arises from the purchase of a vehicle from an automotive dealership.  The purchaser, Plaintiff Christopher Brogan ("Plaintiff"), brought this action on behalf of himself and other similarly situated vehicle purchasers against Fred Beans Chevrolet, Inc. ("Defendant") alleging breach of contract, breach of implied covenant of good faith and fair dealing, and violations of the Pennsylvania Motor Vehicle Sales Finance, 12 Pa. C.S.A. § 6201, *et seq.* ("MVSF"), the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA"), the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.* ("UTPCPL"), and the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA").

Before the Court now is Defendant's Motion for Summary Judgment.  ECF No. 73.

## II.     Background

*The Transaction*

On March 19, 2017, having seen an advertisement on Defendant's website for the "specific car that [he] was looking for," Plaintiff scheduled an appointment to see the car at Defendant's dealership the next day.  ECF No. 74-1 at pp. 37-38. Plaintiff "told [Defendant he was] very busy with work and [he] didn't want to spend all day there for financing.  So, [he] filled out the online application to run [his] credit and everything." *Id*. at p. 38.  "Prior to [him] getting there, [he] told them [he] wanted to make sure that as long as the car was sound, that [he] intended on buying the car.  They assured [him] that financing was in place already." *Id*. Plaintiff's online inquiry to Defendant indicated that he was interested in purchasing guaranteed asset protection ("GAP") coverage as part of his purchase. *Id*. at pp. 38-40.

On March 20, 2017, Plaintiff visited Defendant's dealership and decided to purchase the 2016 Subaru Impreza WRX, VIN #JF1VA2M6XG9804797 (the "Subaru").  ECF No. 74-1 at pp. 14-16, 38-40.  Upon deciding to purchase the Subaru, Plaintiff met with Charles Paris, finance manager at the dealership, to arrange financing.  ECF No. 74-1 at pp. 44.

As part of the purchase of the Subaru, Plaintiff agreed to pay $4,000 cash as a down payment and to trade in his 2013 Hyundai GF, VIN

#KMHHU6KJ9DU100334 (the "Hyundai").  ECF No. 74-1 at pp. 48-51.

Defendant offered to value Plaintiff's Hyundai at $16,000 and because Plaintiff

owed approximately $22,334.63 to First Financial for the Hyundai, ultimately

valued the Hyundai to have $6,334.63 in negative equity.  *Id.* at pp. 48-51, 53 &

19.  Although Defendant is the creditor on most retail installment sales contracts

("RISCs") for vehicles it sells to customers, Defendant's practice is to assign the

RISC to a third-party financial institution.  ECF No. 74 at ¶ 15.

Plaintiff's credit application, executed by Plaintiff at the dealership, stated

the following:

> You understand and agree that you are applying for credit by
> providing the information to complete and submit this credit
> application.  We may keep this application and any other application
> submitted to us and information about you whether or not the
> application is approved . . . .  The words "you," "your" and "yours"
> mean each person submitting this application.  The words "we," "us,"
> "our" and "ours" as used below refer to us, the dealer, and to the
> financial institution(s) selected to receive your application.  You
> authorize us to submit this application and any other application
> submitted in connection with the proposed transaction to the financial
> institutions disclosed to you by us the dealers; in addition, in
> accordance with the Fair Credit Reporting Act, you authorize that
> such financial institutions may submit your applications to other
> financial institutions for the purpose of fulfilling your request to apply
> for credit.  This application will be reviewed by such financial
> institutions on behalf of themselves and us the dealer.  You agree that
> we may obtain a consumer credit report periodically from one or more
> consumer reporting agencies (credit bureaus) in connection with the
> proposed transaction and any update, renewal, refinancing,
> modification or extension of that transaction.  You also agree that we
> or any affiliate of ours may obtain one or more consumer credit
> reports on you at any time whatsoever.  If you ask, you will be told

whether a credit report was requested, and if so, the name and address of any credit bureau from which we or our affiliate obtained your credit report. You agree that we may verify your employment, pay, assets and debts, and that anyone receiving a copy of this is authorized to provide us with such information. You further authorize us to gather whatever credit and employment history we consider necessary and appropriate in evaluating this application and any other applications submitted in connection with the proposed transaction. You understand that we rely on the information in this credit application in making our decision.

ECF No. 74-1 at p. 55.

Plaintiff's credit report reflects that Defendant requested Plaintiff's credit only once, on March 20, 2017. *Id*. at p. 88. Defendant's representative testified that Defendant does not direct financial institutions to conduct credit inquiries and that not all financial institutions request a consumer's credit report every time an application is submitted to obtain financing for a vehicle purchase. ECF No. 75-1 at pp. 21-22 & 25-26. The finance manager testified that he used his experience as finance manager and familiarity with banks to determine that he could obtain financing from Fifth Third Bank for Plaintiff's Subaru purchase. *Id*. at pp. 28-29.

Plaintiff executed the credit application, which was then submitted by Defendant's representative to several financial institutions through a software system. ECF No. 74-1 at pp. 55-57 & 60-61. Plaintiff expected Defendant to shop his application to several financial institutions to obtain the best deal. *Id*. at pp. 16, 20-21 ("Q: And it would not have been unexpected from your p[er]spective, if Fred Beans ran – shopped your deal to one or two financial institutions? A:

4

Correct."); *see also*, *id*. at p. 16 ("It's my understanding that dealerships tend to work with the banks to get you a better rate than your typical bank based on their volume of transactions. So, I just entrusted them in finding me the best rate.").

Defendant submitted a request to TransUnion for Plaintiff's consumer credit report. *Id*. at pp. 82-84 & 86-117. Fifth Third Bank issued a conditional approval of Plaintiff's credit application. *Id*. at p. 80. The finance manager testified that financial institutions do not accept assignment of a loan until after they receive the contract package and perform additional review of the customer's application. ECF No. 75-1 at pp. 14-15. Paris further testified that the financing is not certain until the financial institution compensates the dealership for the loan. *Id*. at pp. 12-13.

The conditional approval issued by Fifth Third Bank on March 20, 2017, was subject to certain limitations and parameters regarding the addition of back-end products. ECF No. 74-1 at p. 80. Plaintiff however, decided to obtain several back-end products, including GAP coverage, a service warranty, and a tire program. *Id*. at p. 48-51.

Plaintiff and Defendant agreed to the transaction based on the terms set forth in the Retail Installment Sales Contract #1 ("RISC #1). RISC #1 included, among other things, a Federal Truth-in-Lending disclosure regarding the financing terms offered by Defendant for the sale of the Subaru:

| FEDERAL TRUTH-IN-LENDING DISCLOSURES | | | | |
|---|---|---|---|---|
| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate | FINANCE CHARGE<br>The dollar amount the credit will cost you | AMOUNT FINANCED | TOTAL OF PAYMENTS | TOTAL SALE PRICE |
| 8.74% | $12,011.45 | $39,242.80 | $51,254.25 | $51,254.25 |

*Id.* at pp. 48-51. RISC #1 further disclosed that, based on the terms of the contract, Plaintiff was to make 75 payments at $683.39 per month. *Id.* It also included a $138 Dealer Fee, a charge for the preparation of documents relating to the transaction. *Id.* Based on RISC #1, Plaintiff left Defendant's dealership and returned home with the Subaru. ECF No. 27 at ¶ 25.

Fifth Third Bank did not ultimately finance RISC #1. ECF No. 74-1 at p. 25. On April 19, 2017, Fifth Third Bank contacted Defendant to inform Paris that it would not finance the Subaru purchase. ECF No. 75-1 at p. 36. Fifth Third Bank's decision not to accept assignment of RISC #1 related to the number and cost of back-end products that Plaintiff wanted on his purchase. ECF No. 74-1 at pp. 68-69; ECF No. 75-1 at p. 16; ECF No. 80-3 at pp. 3-5 ("A: Yeah, I just – you know, this stuff never happens. This bothers me, you know. I was trying to get a better understanding of it, because this isn't a normal thing. … Q: You had said that this situation is unusual. Can you explain to me why this situation is unusual? A: Because we rarely put someone on the road without having all our ducks in a

row with an approval, and customers are usually fine getting it completed if something does go wrong. Q: But wasn't approval already obtained from Fifth Third bank here before he left? A: Correct, but there was – obviously, we had a little too much. This happens from time-to-time usually with back end stuff and customers usually just want to get it over with and they are willing to work out no problem."). Paris testified that Defendant would not have titled the Subaru with a lien to Fifth Third Bank if he had not believed that financing was in place. ECF No. 74-1 at p. 67.

When a bank does not accept assignment of an RISC, the customer owes the purchase price of the vehicle to Defendant. *Id*. at pp. 48-51, 120-123 & 127-131. Upon receiving notice from Fifth Third Bank, Paris testified that he contacted several other banks to see if he could obtain financing for Plaintiff. ECF No. 75-1 at pp. 17-20. As part of that effort, Paris testified that he spoke with a representative of Ally Financial, ECF No. 74-1 at pp. 70-71, which had considered Plaintiff's application on March 20, 2017, *id*. at p. 70-71, 87 & 137. Paris testified that in the course of his inquiry in April 2017, he did not resubmit Plaintiff's application to Ally Financial. *Id*. at pp. 70-72. Through both written and telephonic conversations with Ally Financial, Paris was able to secure financing for the Subaru purchase on April 19, 2017. ECF No. 74-1 at pp. 64-68; ECF No. 75-1 at p. 29, ¶¶ 7-8; *id*. at p. 38.

Paris testified that in order to compensate Plaintiff for any trouble caused by the change in financing, he decided to reduce the annual percentage rate of the RISC. ECF No. 74-1 at pp. 77-78. The decision to lower the interest rate was not required by Ally Financial. *Id*.

On or about April 20, 2017, Paris sent Plaintiff a second RISC ("RISC #2"), which was different than RISC #1. *Id*. at pp. 119-123. RISC #2, dated March 20, 2017, provided, among other things, the following disclosures:

| FEDERAL TRUTH-IN-LENDING DISCLOSURES | | | | |
|---|---|---|---|---|
| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you | AMOUNT FINANCED | TOTAL OF PAYMENTS | TOTAL SALE PRICE |
| 8.5% | $11,656.70 | $39,242.80 | $50,899.50 | $50,899.50 |

*Id*. at pp. 119-123.

RISC #2 further disclosed that Plaintiff was to make 75 payments of $678.66 per month beginning on May 4, 2019. *Id*. Defendant again included a $138 Dealer Fee, a charge for the preparation of documents relating to the transaction. *Id*. RISC #2 represented that financing for the Subaru was assigned to Ally Financial. ECF No. 27 at ¶ 33. On or about May 9, 2017, First Investors' Financial received Defendant's payment for payoff of Plaintiff's loan on the

Hyundai. ECF No. 74-1 at pp. 98-99.[1] No delinquencies were reported on Plaintiff's July 26, 2017 consumer report related to Defendant's payoff of the Hyundai. *Id*. at p. 99.

Plaintiff did not return an executed copy of RISC #2 to Defendant, so consequently, Defendant was required to draft and send RISC #3. ECF No. 74-1 at pp. 74-75. RISC #3 was dated May 19, 2017, and provides the same financial disclosures included in RISC #2. *Id*. at pp. 127-131. RISC #3 further disclosed that Plaintiff was to make 75 payments of $678.66 per month beginning on July 3, 2017, and that financing was assigned to Ally Financial. *Id*.

As of June 5, 2017, Plaintiff had not returned RISC #3 to Defendant, so Paris contacted Plaintiff to inquire about when Plaintiff would return RISC #3. ECF No. 75-1 at pp. 40-43 & 45. On June 15, 2017, Plaintiff executed the blank Ally Financial loan application and returned it with RISC #3 to Defendant. ECF No. 9 at pg. 32; ECF No. 75-1 at p 47; ECF No. 74-1 at pp. 30-31. The Ally Financial loan application, which Defendant testified is a generic credit application form, included the following:

> By signing this application, I certify that the information in my application is complete and true. I authorize the dealer, Ally Financial, Ally Bank, a/k/a Ally Capital in Hawaii, a/k/a Ally Capital Corp. in

---

[1] As per the agreement, Defendant's representative testified that Defendant initially submitted payment to satisfy the Hyundai loan on March 31, 2017, in accordance with the execution of RISC #1, but that payment was returned to the dealership. ECF No. 75-1 at pp. 34-35.

Mississippi, Montana, New Jersey, and Wisconsin, and a/k/a Ally Bank Corp. in New Mexico, to investigate my credit and employment history, obtain credit reports, and release information about their credit experience with me. If an account is created, I authorize the obtaining of credit reports for purposes of reviewing or taking collection action on the account for other legitimate purposes associated with the account.

ECF No. 75-1 at p. 49. Defendant forwarded the executed application to Ally Financial. ECF No. 74-1 at p. 134. On June 26, 2017, Ally Financial submitted a request from TransUnion to obtain Plaintiff's credit report. *Id*. at pp. 87 & 135. On July 6, 2017, Ally Financial submitted a request from TransUnion to obtain Plaintiff's credit report. *Id*. at pp. 87, 135-136 & 138-139. Ally Financial would not accept assignment of RISC #3 until after the first payment became due and owing at the beginning of July 2017, ECF No. 75-1 at pp. 23-24, and it received the July 6, 2017 credit application, ECF No. 74-1 at pp. 138-139.

Plaintiff refused to make any payment to Defendant, so Defendant consequently covered the loss. ECF No. 75-1 at p. 24 ("It's – because that's what – we paid it. We asked Mr. Brogan for it and he said, no. Q: Fred Beans made a payment on behalf of Mr. Brogan to Ally? A: Yes. Well, they just – it looks like they just shorted us the money. Technically, we paid it, but they just didn't pay us that amount."); ECF No. 74-1 at p. 29. Plaintiff admits that he drove the Subaru from March 20, 2017, until July 3, 2017, without a payment becoming due and owing. ECF No. 74-1 at p. 27.

On July 20, 2017, Ally Financial paid Defendant $38,564.14, the total amount financed in RISC #3 minus the first payment of $678.66.  ECF No. 75-1 at pp. 51-56.  Defendant wrote off the payment it made on behalf of Plaintiff as a business loss.  *Id*.; *id*. at p. 24.  After making his $4,000 payment on March 20, 2017, Plaintiff did not make any further payment to Defendant.  ECF No. 74-1 at p. 29.

It is worth noting that all three RISCs at issue in this matter are all form contracts, which include the length of financing, annual percentage rate, finance charge, amount financed, total of payments, and total sale price.  ECF No. 27 at ¶ 63.  All three are pre-printed forms that state:  "The Annual Percentage Rate may be negotiable with the Seller.  *The Seller may assign this contract and retain its right to receive a part of the Finance Charge*."  ECF No. 74-1 at pp. 48-51, 120-123 & 127-131.  Each of the RISCs identifies the "Seller-Creditor" as Defendant and state that the buyer "agree[s] to pay the Seller-Creditor . . . the Amount Financed and Finance Charge in U.S. funds according to the payment schedule below."  *Id*.  They also each state: "This contract contains the entire agreement between you and us relating to this contract.  Any change to this contract must be in writing and we must sign it.  No oral changes are binding."  *Id*.  Plaintiff acknowledges that he did not make any payments pursuant to RISC #1, *id*. at pp. 26-27, and that he did not think he was buying two Subaru vehicles nor did he

expect that signing the additional RISCs would require him to pay additional money to Defendant, *id*. at p. 28 ("Q:  Well, you have two contracts both for the purchase of a 2016 Subaru and present.  Did you think that by signing the second contract, you were buying a second 2016 Subaru Impreza?  A:  I did not think I was buying a second car, no.").

*The Class Action*

Plaintiff asserted the following claims in his Second Amended Complaint: breach of contract for stating incorrect finance charges and failing to cancel the previous RISCs in writing (Count I); breach of the implied covenant of good faith and fair dealing for stating incorrect finance charges and failing to cancel the previous RISCs in writing (Count II); MVSF claims for stating incorrect finance charges (Count III); TILA claims for stating incorrect finance charges and requiring multiple RISCs (Count IV); UTPCPL claims for stating incorrect finance charges, issuing multiple RISCs, and imposing a $138 Dealer Fee (Count V); and FCRA claims for continuing to conduct credit inquiries after executing a RISC (Count VI).  ECF No. 27, Second Am. Compl.

*Changes in Case Theory*

At the pretrial conference hearing held pursuant to Rule 16 of the Federal Rules of Civil Procedure on December 14, 2018, Plaintiff's counsel represented that the crux of the case was that Defendants had a practice of leading customers to

believe the vehicle purchase transaction was complete so that the dealership could continue to shop the financing deal terms in order to garner a better financing rate for itself all while "the unpaid balances on their trade-ins when trade-ins are involved are not getting paid off." ECF No. 35, at pp. 9-10. In other words, "[u]nbeknownst to the consumer the allegation is they're still shopping the deal around and they're shopping the deal around to keep on pulling the credit to see what the best deals the car dealership can really get." *Id*. at p. 10. Plaintiff asserted that to the detriment of himself and the putative class, Defendant was "trying to find their best quote/unquote brokerage fee from the deal, just immediately transferring the financing out." *Id*. In response, Defendant stated that "discovery will establish that the circumstances of Mr. Brogan's purchase involving the multiple retail installment contracts and multiple credit checks are an individualized circumstance and not a common practice of the dealership." *Id*. at pp. 10-11.

At a status conference held on July 8, 2019, apparently not finding through discovery that his speculated theory that the dealership was shopping the deal around in all of these installment sales contracts, Plaintiff shifted his theory of the case to an entirely new one: that Defendant had Plaintiff sign RISC #1 and leave the dealership with the Subaru without properly securing financing in order to "get these transactions done." ECF No. 71 at p. 56. However, the record or the facts do

not support this theory either, and, as a result, we are left with amorphous speculations by Plaintiff in search of a class pointing to allegations in the complaint and very little else.  The Plaintiff made arguments in search of a foundation, and despite extensive discovery finding no foundation, still soldiered on so as to now ask this Court, through its own efforts and initiative, to find a basis to deny summary judgment and find a class by a rigorous review of the record that Plaintiff himself, despite extensive discovery, could not find.

*Plaintiff's Motion for Summary Judgment*

Defendant moves for summary judgment on all counts of the Second Amended Complaint.  ECF No. 73.  Plaintiff filed a Response in Opposition to Defendant's Motion for Summary Judgment, ECF No. 81, and Defendant thereafter filed a Reply, ECF No. 85.  The Court heard oral argument on this motion on January 16, 2020.  ECF No. 88.

## III.  Standard of Review

Summary judgment "is appropriate where the moving party has established 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Burton v. Teleflex, Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (quoting Fed. R. Civ. P. 56(a)).  "A fact is material if it might affect the outcome of the suit under the governing law."  *Id*.  When reviewing a motion for summary judgment, the court views "the facts in the light most favorable to the

non-moving party and draws all reasonable inferences in that party's favor." *Id*.

"[T]he non-moving party must present more than a mere scintilla of evidence" and must present evidence on which a jury could reasonably find for that party. *Id*. (internal quotation and citation omitted). Additionally, "[s]ummary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Wright v. Corning*, 679 F.3d 101, 105 (3d Cir. 2012) (internal quotation and citations omitted).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007); Fed. R. Civ. P. 56(c). As the Supreme Court has emphasized "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id*. (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986)).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment, the

requirement is that there be no genuine issue of material fact." *Id*. (quotation and citation omitted). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*.

## IV. Discussion

For the following reasons, Defendant's Motion for Summary Judgment will be granted as to all Counts in the Second Amended Complaint.

### A. Count I – Breach of Contract

In Count I, Plaintiff alleges that Defendant breached the contracts between the parties in two ways: 1) "by falsely requesting an amount that exceeds the amount which is supposed to be paid based on the length of financing, the amount financed, and annual percentage rate," ECF No. 27 at ¶ 65; and 2) "[d]espite entering into final and binding contracts for the sale of vehicles with Plaintiff, Defendant breaches retail installment sales contracts by issuing new retail installment sales contracts on different terms than those in the initially executed and binding agreements, without anything in writing confirming that the prior agreement was cancelled," *id*. at ¶ 67. Plaintiff asserts it is "entitled to damages in the amount that the court may allow, along with attorneys' fees and expenses." *Id*. at ¶ 68.

As to Plaintiff's first theory of liability, that Defendant breached the RISCs by falsely requesting an amount exceeding the amount that is supposed to be paid based on the length of financing, the amount financed, and annual percentage rate, Defendant contends that it did not violate the RISC because it did not request an amount that exceeds what is supposed to be paid. ECF No. 73-1 at pp. 18-19. Strikingly, in response to Defendant's argument, Plaintiff does not specifically rebut Defendant's justification for its financing calculations. Instead, Plaintiff takes issue with Defendant's use of an expert opinion to support its calculations against Plaintiff's accusations and states that "all of Plaintiff's claims regarding the overstated finance charges in the RISCs should be allowed to proceed." ECF No. 81 at pp. 18-19.

It bears reminding that at the summary judgment stage of this protracted litigation, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott*, 550 U.S. at 380 (citation omitted). Plaintiff has been aware that he bears the burden of proving his claims since he commenced this action in December of 2017. At this stage, Plaintiff should be adequately prepared to put forth evidence that the finance calculations he alleged were miscalculated were actually miscalculated in order to prove not only his claim for breach of contract in Count I, but also his claim for violating the MVSF in Count III, his

claim for violating TILA in Count IV, and his claim for violating the UTPCPL in Count V.

Notably, Plaintiff should be prepared at this stage to support his accusations regarding the miscalculated financing on behalf of the entire class, not just as it relates to his own transaction. But nonetheless, Plaintiff is not prepared to defend his accusations and cannot cite to any authority to support the conjectures contained in the Second Amended Complaint. Instead, Plaintiff seeks to be "afforded the opportunity to depose Defendant's expert and (if need be) to introduce an expert of his own before this Court considers dismissing Plaintiff's viable claims regarding the finance charge calculations." ECF No. 81 at p. 18. The Court sees no reason or need to afford Plaintiff yet more time to develop these unfruitful claims.

Both RISC #1 and RISC #3 state that the interest will be calculated on a daily basis. ECF No. 74-1 at pp. 120-123 & 127-131. Plaintiff testified that he understood that provision to mean that the amount of finance charges in the RISCs were estimated based on the Subaru being paid off on a particular day and if payments were made later, the finance charges would increase. *Id.* at pp. 23-24. The backside of each RISC is titled "OTHER IMPORTANT AGREEMENTS." *Id.* at pp. 50-51, 120-123 & 127-131. Section 1, titled "FINANCE CHARGE PAYMENTS," states in pertinent part:

a.  **How we will figure the Finance Charge.** We will figure the Finance Charge on a daily basis at the Annual Percentage Rate on the unpaid part of the Amount Financed.

b.  **How we will apply payments.** We may apply each payment to the earned and unpaid part of the Finance Charge to the unpaid part of the Amount Financed and to other amounts you owe under this contract in any order we choose.

c.  **How late payments or early payments change what you must pay.** We based the Finance Charge, Total of Payments, and Total Sale Price shown on the front on the assumption that you will make every payment on the day it is due. Your Finance Charge, Total of Payments, and Total Sale Price will be more if you pay late and less if you pay early. Changes may take the form of a larger or smaller final payment or, at our option, more or fewer payments with a smaller final payment. We will send you a notice telling you about these changes before the final payment is due.

*Id*. Each RISC provided for an irregular first payment period as well. RISC #1 consummated on March 2, 2017, had a first payment date of May 4, 2017 (44 days later), with subsequent payments due every month thereafter. *Id*. at pp. 50-51. RISC #3, dated May 19, 2017, has a first payment date of July 3, 2017 (44 days later), with subsequent payments due every month thereafter. *Id*. at pp. 127-131.

Plaintiff has wholly failed to make a showing to the Court that there remains a genuine issue of material fact as to this claim. Indeed, Plaintiff is not entitled to trial on this claim because he now promises that he will be prepared at trial to meet his burden of proof. *See Scott*, 550 U.S. at 380. The terms of the RISCs are consistent with the financing and the calculations are accurate. Indeed, the accuracy of Defendant's calculations are further evidenced by the fact that a

financial institution purchased the contract from Defendant and assumed Defendant's role as Plaintiff's creditor. Plaintiff continues to pay Ally Financial without objection in accordance with the very terms he hypothesized were incorrect beginning in December 2017. Moreover, there is no evidence that Ally Financial ever raised any issues with Defendant as to the calculations as stated in RISC #3. Accordingly, Defendant is entitled to judgment as a matter of law on Count I as it relates to the miscalculations allegations.

As to Plaintiff's second theory of liability, that Defendant breached the RISCs by issuing new retail installment sales contracts on different terms than those in the initially executed and binding agreements, without anything in writing confirming that the prior agreement was cancelled, Defendant contends that it did not breach the RISCs because "each subsequent RISC served as a novation which cancelled the prior RISC." ECF No. 73-1 at p. 21. Defendant asserts that the "record is devoid of any fact which would suggest anything other than an intention for each subsequent RISC to replace the prior RISC." *Id*. at p. 22. Plaintiff argues, in response, that there was no novation of RISC #1 because there was no new consideration provided with RISC #2 or RISC #3, "nor was the original contract 'displaced.'" ECF No. 81 at p. 19.

As RISC #2 was never executed, the issue before the Court is whether RISC #3 was a novation of RISC #1. "Under Pennsylvania law, the party arguing that a

new agreement constitutes a novation must establish the following elements: 'the displacement and extinction of a valid contract, the substitution for it of a new contract, a sufficient legal consideration for the new contract, and the consent of the parties.'" *GE Capital Mortg. Servs., Inc. v. Pinnacle Mortg. Inv. Corp.*, 897 F. Supp. 854, 864 (E.D. Pa. 1995) (quoting *Buttonwood Farms, Inc. v. Carson*, 478 A.2d 484, 486 (Pa. Super. 1984) (citation omitted)). "The party asserting a novation . . . has the burden of proving that the parties intended to discharge the earlier contract." *Id*. (quoting *Buttonwood Farms*, 478 A.2d at 486). "Such intention 'may be shown by other writings, or by words, or by conduct or by all three.'" *Id*.

Here, all four requirements of a novation are met regarding RISC #3. First, neither party disputes that RISC #1 was a valid contract. Next, the record makes clear that RISC #3 substituted RISC #1 and that the parties intended so and consented to such. Plaintiff's own testimony evidences the parties' intent for RISC #3 to replace RISC #1. Indeed, Plaintiff testified that he did not make any payments pursuant to RISC #1. ECF No. 74-1 at pp. 26-27. And more ruinous to Plaintiff's argument, Plaintiff also acknowledged that he did not think he was buying two Subaru vehicles, nor did he expect that signing the additional RISCs would require him to pay additional money to Defendant. *Id*. at p. 28 ("Q: Well, you have two contracts both for the purchase of a 2016 Subaru and present. Did

you think that by signing the second contract, you were buying a second 2016 Subaru Impreza? A: I did not think I was buying a second car, no.").

Thus, Plaintiff's intent to replace RISC #1 with RISC #3 is evidenced not only by his own testimony, but also by his actions. The first payment Plaintiff made on his Subaru was made *after* RISC #3 was executed. Plaintiff did not make any payments as to RISC #1 and for good reason: the foundation upon which the parties entered into RISC #1, that Fifth Third Bank would provide financing for the Subaru purchase, ended up falling through. Thus, RISC #1 was no longer operative. Accordingly, Defendant obtained new financing from another financial institution and proposed RISC #2 to Plaintiff for his review and execution. However, Plaintiff failed to return RISC #2 to Defendant in a timely manner, so Defendant drafted and sent RISC #3 to Plaintiff. After negotiation as to who would make the first payment on the Subaru, which Defendant ultimately undertook as a loss, Plaintiff executed RISC #3 and the transaction was complete.

Finally, there was sufficient legal consideration for the new contract. Notably, Plaintiff argues that consideration is lacking for RISC #3 but does not ask the Court for rescission of that contract. Plaintiff does not ask for such a remedy likely because not only has Plaintiff received benefit under RISC #3, but because he also plans to retain that benefit: use of the car at the financing terms provided in the contract. Regardless, there was sufficient legal consideration for RISC #3.

Plaintiff received not only a lower interest rate than RISC #1 offered, but also financing from a financial institution that included the entire purchase price of the Subaru, including the back-end options Plaintiff received. Accordingly, all four requirements of a novation are met here.

Plaintiff's argument that RISC #3 is not a novation of RISC #1 rests entirely upon Plaintiff's theory that Defendant acted throughout this entire transaction with nefarious intent to deceive Plaintiff in order to obtain better financing terms to its own benefit and Plaintiff's detriment. Plaintiff was so sure of the truth of his conjecture that he filed an entire class action based on it, alleging not only that Defendant systematically defrauded Plaintiff, but also that it systematically defrauded all of its customers in the same ways. When initial discovery did not appear to support that speculation, Plaintiff introduced his new theory that Defendant had Plaintiff sign RISC #1 and drive off the lot with the Subaru knowing that financing from Fifth Third Bank would fall through in order to complete the transaction so that Plaintiff would be locked into the deal with little recourse. However, the record makes clear that the nature in which this transaction took place was not commonplace at the dealership.

The Court finds that RISC #3 was a novation of RISC #1 and thus, Defendant did not breach RISC #1. Because the Court finds that Defendant is entitled to judgment as a matter of law as to both parts of Count I's breach of

contract claim, Count I will be accordingly denied as a matter of law.

**B.    Count II – Violations of the Covenant of Good Faith and Fair Dealing**

In Count II, Plaintiff alleges that Defendant "failed in its duty of good faith and fair dealing by charging Plaintiff and members of the Putative Class a finance charge that exceeded the amount set forth in the retail sales installment contracts" and that Defendant "further failed in its duty of good faith and fair dealing by failing to perform as required under retail sales installment contracts, and reissuing new retail installment sales contracts at new terms, at its whim, to the detriment of Plaintiff and members of the Putative Classes." ECF No. 27 at ¶¶ 71 & 72.

Defendant contends that Plaintiff's claim for violation of the implied covenant of good faith and fair dealing should be denied because Pennsylvania law does not acknowledge a separate claim for breach of the implied covenant of good faith and fair dealing. ECF No. 73-1 at p. 27. Rather, Defendant asserts that this claim is subsumed by Plaintiff's breach of contract claim in Count I. *Id.* Plaintiff argues that his claim for breach of the implied covenant of good faith and fair dealing is not duplicative of his breach of contract claim because he asserts Defendant violated the former when it failed to satisfy the outstanding note on Plaintiff's traded-in Hyundai when he bought the Subaru with the execution of RISC #1, which is not included as part of his breach of contract claim. ECF No. 81 at p. 29. Further, Plaintiff posits that the requirement to satisfy the outstanding

note was not an express term of the RISC but was instead an implied duty of Defendant because the payoff was included in the loan. *Id.* at p. 30.

Regardless of whether Pennsylvania law permits a separate cause of action for breach of the implied covenant of good faith and fair dealing in this particular instance, the Court finds that Defendant is entitled to judgment as a matter of law as to Count II. Defendant initially submitted payment to satisfy the Hyundai loan on March 31, 2017, in accordance with the execution of RISC #1. ECF No. 75-1 at pp. 34-35. That initial payment was returned to Defendant, but on or about May 9, 2017, First Investors' Financial received Defendant's payment for payoff of Plaintiff's loan on the Hyundai. ECF No. 74-1 at p. 125. Plaintiff acknowledges that "no delinquencies were reported on [his] July 26, 2017 consumer report related to [Defendant]'s payoff of the Hyundai. *Id.* at p. 99.

"Under Pennsylvania law, [p]laintiffs must show three elements to establish a claim for breach of contract based on the breach of the implied covenant of good faith and fair dealing: (1) the existence of a contract and the content of its essential terms, (2) the [d]efendants breached the implied covenant of good faith and fair dealing by breaching a specific contractual duty, and (3) resultant damages." *Scott v. Foremost Ins. Co.*, No. 15-3257, 2015 WL 5818267, at *4 (E.D. Pa. Sept. 30, 2015) (citations omitted). Plaintiff's claim fails as a matter of law because even if the Court found that the delay in Defendant's payoff of the Hyundai loan

constituted a breach of the implied covenant of good faith and fair dealing, though it does not, Plaintiff admits that he has suffered no harm from the alleged breach. The loan was eventually paid off by Defendant in accordance with the transaction terms, and Plaintiff has put forth no evidence to show that any alleged delay in payment caused any damage to Plaintiff. Accordingly, Count II will be denied as a matter of law.

### C.     Count III – Violations of the Motor Vehicle Sales Finance

In Count III, Plaintiff alleges that "Defendant intentionally miscalculated the finance charge in each of the RISCs based on the amount financed and the annual rate and failed to adhere to 12 Pa. C.S.A. § 6243(b)(2)(i), (ii) and (iii)." ECF No. 27 at ¶ 81. Section 6243 states, in pertinent part:

**(b) Method of computation.--**

(1) An installment seller may compute a finance charge authorized by this section by any method, if the charge does not exceed the applicable maximum percentage under subsections (d) and (e).

(2) A finance charge under this section shall be computed:

(i) On the principal amount financed as determined under section 6222(5)(vi) (relating to contents).

(ii) At the annual rate indicated on a one-year installment sale contract.

(iii) Proportionately on an installment sale contract that extends for a period that is less than or greater than one year.

. . . .

**(d) New motor vehicles.--**

> (1) Except as otherwise provided in this section, a finance charge for a new motor vehicle may not exceed the equivalent of 18% simple interest per year on the unpaid balance.

> (2) Except as provided in paragraph (3), a finance charge for a new motor vehicle having a purchase price of $10,000 or more and used primarily for a commercial purpose may not exceed the equivalent of 7.5% per year.

> (3) A finance charge may not exceed the equivalent of 10% per year for the following:

>> (i) A new truck and truck tractor having a manufacturer's gross vehicular weight of 13,000 pounds or more.

>> (ii) A new semitrailer and trailer designed for use in combination with a truck tractor.

Pa. C.S. § 6243.

Defendant contends that it is entitled to judgment as a matter of law as to Count III because the finance calculations were done correctly and the MVSF does not provide a private cause of action. ECF No. 73-1 at p. 28. Rather, Defendant asserts that the MVSF requires that a plaintiff must seek recovery for violations of the MVSF under the UTPCPL. *Id*. (citing 12 Pa. C.S. § 6355 ("A violation of any provision of this chapter shall be deemed to be a violation of the . . . Unfair Trade Practices and Consumer Protection Law.")). Because Plaintiff's UTPCPL claim includes the allegation that Defendant miscalculated the finance charges, Defendant argues that Plaintiff's MVSF claim should be dismissed as duplicative. *Id*. In response, Plaintiff asserts that the MVSF does provide a private right of

action and cites to several state court cases in which he asserts Pennsylvania state courts have permitted a private right of action where a financing provision of the MVSF was violated. ECF No. 81 at p. 31.

Regardless of whether Plaintiff's MVSF claim is duplicative of his UTPCPL claim—though the Court tends to believe that it is—Defendant is entitled to judgment as a matter of law as to Count III because Plaintiff has again failed to show that there is a genuine issue of material fact prohibiting Count III from being denied on summary judgment. As previously discussed, Plaintiff carries the burden of proving each one of his claims, and although Plaintiff has offered an alternative calculation in his briefs opposing Defendant's motions to dismiss, Plaintiff has offered no evidence or citation to authority to show that Defendant's method of calculation is impermissible under the MVSF. The MVSF permits a creditor to utilize one of multiple methods of calculation as long as the method is disclosed in the contract and does not exceed the limits set forth in subpart (d) of § 6243. The Court has already found that the method of calculation was adequately disclosed in the RISCs at issue in this case and that the terms were consistent with the actual calculations made by Defendant. Furthermore, Plaintiff is unable at this time to articulate to the Court how Defendant's calculations specifically violate the MVSF, much less to present any evidence either to support such a claim or to show that there exists a genuine issue of material fact that warrants denial of Defendant's

motion for summary judgment as to this claim.  Accordingly, Count III will be denied as a matter of law.

### D.    Count IV – Violations of the Truth in Lending Act

In Count IV, Plaintiff alleges that the "Federal Truth in Lending Disclosures in the retail sales installment contracts were false and misleading as, among other reasons, the dealership repeatedly miscalculated financing terms in its favor in order to generate further revenue from automobile sales" and that "Defendant had no intention to honor the financing terms contained in its retail sales installment contracts, which were subject to Defendant's unilateral determination."  ECF No. 27 at ¶¶ 89 & 90.

Defendant contends that Count IV should be denied as a matter of law because Plaintiff "can offer no set of facts where the initial disclosure prior to entering the obligation (RISC #1) failed to fully apprise [Plaintiff] of the entirety of the obligation.  If anything, [Defendant] only eased the obligation by amending the parties' agreement."  ECF No. 73-1 at p. 23.  Defendant also points out that Plaintiff has yet again failed to set forth with specificity how Defendant's calculations violate TILA, much less put forth any evidence to support his claim and show that there is a genuine issue of material fact related to this claim barring the Court from entering judgment as a matter of law.  In response, Plaintiff makes three sweepingly general claims about how Defendant "violated TILA."  ECF No.

81 at p. 24. First, Plaintiff claims that because Defendant "always retained the unilateral right to change the financing terms for a transaction," the terms were illusory. *Id*. In other words, because the credit in RISC #1 never "actually existed, as Fifth Third [Bank] never approved the financing," "it is clear that Fred Beans violated TILA." *Id*. Second, Plaintiff claims that Defendant further violated TILA "because it intentionally misstated the finance charges within the RISCs." *Id*. And third, Plaintiff claims Defendant "repeatedly miscalculated the financing terms of the RISCs in its favor in order to generate further revenue from automobile sales." *Id*.

As discussed at length previously, Plaintiff's inability at this late stage in litigation to articulate how Defendant's conduct violated specific provisions of a statute upon which he sought not only to state a claim for himself but also for an entire class of allegedly harmed consumers is insufficient. Defendant has painstakingly explained how its calculations complied with TILA and in response Plaintiff only merely reiterates the allegations he made in the Second Amended Complaint. As to Plaintiff's first allegation that the terms of the RISCs were illusory, the Court has already found that Defendant signed RISC #1 with the understanding that financing was in fact secured by Fifth Third Bank. The Court further found that RISC #3 was a proper novation of RISC #1 and thus, the terms of neither agreement were "illusory." Indeed, RISC #3 is still operative and **both**

parties continue to perform pursuant to the terms of RISC #3.  As to Plaintiff's second and third allegations, that Defendant intentionally misstated the finance charges and intentionally miscalculated the finance terms, the Court has already found that neither of these allegations has proven to be true.  Accordingly, Count IV will be denied as a matter of law.

E.     **Count V – Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law**

In Count V, Plaintiff alleges that Defendant violated the UTPCPL in the following ways:

- 1) "by knowingly stating false finance charges in retail installment sales contracts that it routinely and regularly entered into with consumers," ECF No. 27 at ¶ 95;

- 2) "by charging consumers in its retail sales installment agreements dealer fees that were purportedly for services rendered in preparing documentation for automobile sales.  The dealer fees, however, bear no rational relationship to costs associated with document preparation, but are actually a hidden expense to consumers so the Defendant can generate further revenue from automobile sales," *id*. at ¶ 96; and

- 3) "by presenting consumers with numerous retail sales installment contracts, even though the contracts are final binding agreements, for Defendant's own benefit so that consumers are bound by the

agreement while the Defendant is not," *id*. at ¶ 97.

Plaintiff alleges that he "suffered an ascertainable loss of money through the down

payments that are used to purchase vehicles from Defendant based on the

fraudulent or deceptive terms set forth above" and "through the traded in vehicles

that are used to purchase vehicles from Defendant based on the fraudulent or

deceptive terms set forth above." *Id*. at ¶¶ 98-99.

As an initial matter, the Court has already ruled upon Plaintiff's claims as

they relate to allegations that Defendant miscalculated financing terms and

presented Plaintiff with multiple RISCs for Defendant's own benefit. In

accordance with those findings, which have already been discussed at length,

Count V will be denied as a matter of law as to those two claims.

As to Plaintiff's UTPCPL claim as related to dealer/document fees charged

by Defendant, the Court also finds that Defendant is entitled to judgment as a

matter of law. The UTPCPL "provides a private cause of action to any person

who, as a result of conduct that the UTPCPL prohibits, 'suffers any ascertainable

loss of money or property, real or personal.'" *Grimes v. Enter. Leasing Co. of*

*Philadelphia, LLC*, 105 A.3d 1188, 1190 (Pa. 2014) (quoting 73 P.S. § 201–

9.2(a)). In this case, Plaintiff alleges Defendant violated the following two sub-

provisions of the UTPCPL: "(v) Representing that goods or services have

sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that

they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have," and the "catchall" provision "(xxi) engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."[2]

"The UTPCPL allows any person who, as a result of a UTPCPL violation, suffers 'any ascertainable loss of money or property, real or personal,' to bring suit:

> Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by [73 P.S. § 201–3] may bring a private action, to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees."

*Grimes* 105 A.3d at 1190-1191 (citing 73 P.S. § 201–9.2(a)).

Plaintiff alleges that Defendant violated the UTPCPL "by charging consumers in its retail sales installment agreements dealer fees that were purportedly for services rendered in preparing documentation for automobile sales." *Id*. at ¶ 96. The "dealer fees, however, bear no rational relationship to costs

---

[2] Plaintiff cites in the Second Amended Complaint to the sub-provision (xvii) but includes the language of sub-provision (xxi). ECF No. 27 at ¶ 94. Because sub-provision (xvii) is not applicable to this matter, the Court will assume Plaintiff intended to allege a violation of sub-provision (xxi).

associated with document preparation, but are actually a hidden expense to consumers so the Defendant can generate further revenue from automobile sales." *Id*.

Defendant contends that summary judgment should be granted on this claim because the $138 fee is expressly permitted by law and "Plaintiff has not offered any evidence to demonstrate that the fee is otherwise false or misleading under the UTPCPL, especially since Plaintiff admitted that the 'Dealer Fee' is that charge for documentary preparation." ECF No. 73-1 at pp. 26-27. Indeed, Plaintiff acknowledged that Defendant includes in the RISCs "a documentation fee (sometimes listed as a 'Dealer Fee')," and that the "Dealer Fee is represented as a charge for preparing documents related to transactions." ECF No. 74 at ¶¶ 4 & 5.

Specifically, Defendant asserts that Pennsylvania law expressly permits dealers to charge the exact type and amount of fees charged by Defendant to Plaintiff. ECF No. 73-1 at p. 26. Plaintiff asserts in response that "[a]lthough the state has set a maximum amount, there is no requirement under state law that the dealer charge the <u>maximum</u> amount." ECF No. 81 at p. 27 (emphasis in original). Plaintiff argues that because state law does not require that the dealer charge the maximum amount, it somehow requires that the "dealer was not simply to charge the maximum permitted by law, but that the fee charged bear a relationship to the cost of the services performed." *Id*. at pp. 27-28. Plaintiff provides no statutory

language or case law citations to support his flawed logic.

Section 818.27a(a) states, in pertinent part:

[A] licensed dealer who has a contract with the Department of Transportation pursuant to 75 Pa. C.S. § 7501 (relating to authorization of messenger and agent services) may charge the purchaser of a vehicle a licensing cost permissible under 75 Pa. C.S. Ch. 19 (relating to fees) and the act . . . known as the Unfair Trade Practices and Consumer Protection Law, and regulations promulgated thereunder, to include any of the following:

   (1)   The actual cost incurred by the dealer for fees associated with titling and registering the vehicle, including messenger fees, notary fees and electronic fees.

   (2)   A documentary preparation charge for:

      (i)   Preparation and completion of documents required to register and license the vehicle under 75 Pa. C.S. (relating to vehicles).

      (ii)   Collection and submission of taxes payable by the purchaser.

      (iii)   Preparation of any other information associated with titling and registration of a vehicle.

      (iv)   Complying with Federal and State laws and regulations relating to the privacy and safeguarding of customer information requirements, providing financial services to the customers and preparation and retrieval of documents.

63 P.S. § 818.27a. It is undisputed that the maximum charge is adjusted annually

based on the United States Department of Labor's Consumer Price Index and that

at the relevant time, the maximum documentary preparation fee was $138 for

electronic preparation and $116 for non-electronic preparation. 47 Pa.B. 812.

It is no doubt a canon of statutory interpretation that "[w]e assume . . . that every word in a statute has meaning and avoid interpreting one part of a statute in a manner that renders another part superfluous." *Disabled in Action of Pennsylvania v. Se. Pennsylvania Transp. Auth.*, 539 F.3d 199, 210 (3d Cir. 2008) (citation omitted). Subsection (1) of § 818.27a requires that the dealer charge consumers the "actual cost" "for fees associated with titling and registering the vehicle, including messenger fees, notary fees and electronic fees." 63 P.S. § 818.27a(a)(1). However, in subsection (2), the statute does not require that the documentary preparation charge be the "actual cost" like Subsection (1) requires. Absent any case law to the contrary, the Court sees no reason why it should read into the statute the requirement that the documentary preparation charge be tied to the actual costs incurred for the litany of services and supplies enumerated in subparts (i) through (iv).

Furthermore, the manner in which Defendant included the documentary preparation charge in the RISCs does not violate the UTPCPL either. Plaintiff argues that the documentary preparation fee is to be negotiable and not pre-printed on the forms used for the transaction. ECF No. 81 at p. 29 (citing to a Memorandum from Daniel G. Murphy, Chairperson, Pennsylvania State Board of Vehicle Manufacturers, Dealers and Salesperson). Regardless of the bearing of that memorandum on Defendant's permitted conduct, the Court finds that the

nature in which Defendant presented the documentary fee charge was not misleading to Plaintiff. The charge is recorded on the RISC as a particular sum with the recipient of the fee identified as the dealership. ECF No. 74-1 at p. 49. The fee is not hidden in a random provision of the agreement or pre-printed on the form in the sense that it is part of the boilerplate language automatically included in each RISC. Rather, it is inserted into the RISCs by Defendant along with all of the other variable terms of the agreement and presented to Plaintiff for his voluntary agreement and execution.

Accordingly, the Court finds that Defendant is entitled to judgment as a matter of law as to Count V as against Plaintiff.

## F. Count VI – Violations of the Fair Credit Reporting Act

In Count VI, Plaintiff alleges that "Defendant violated Sections 1681 of the [FCRA] by willfully and negligently causing unauthorized and excessive credit inquiries to be made of Plaintiff and the Class." ECF No. 27 at ¶ 105. Plaintiff asserts that the "conduct of Defendant was a direct and proximate cause, as well as a substantial factor in bringing about the harm to the Plaintiff" and that the "violations were willful. Fred Beans knew that it was required to obtain Plaintiff's consent prior to submitting subsequent credit inquiries after it agreed to provide financing. Fred Beans acted in deliberate or reckless disregard of its obligations and the rights of Plaintiff and other Class members under 15 U.S.C. §

1681(b)(2)(A)(i)." *Id*. at ¶¶ 107 & 108.

The FCRA prohibits a person from "obtaining" or "using" a consumer's report except under certain circumstances:

**(f) Certain use or obtaining of information prohibited**

A person shall not use or obtain a consumer report for any purpose unless--

(1)     the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and

(2)     the purpose is certified in accordance with section 1681e of this title by a prospective user of the report through a general or specific certification.

15 U.S.C. § 1681b.  Subsection (a) of § 1681b provides the authorized purposes for which a consumer-reporting agency may furnish a consumer report to another:

any consumer reporting agency may furnish a consumer report under the following circumstances and no other:

. . . .

(2)     In accordance with the written instructions of the consumer to whom it relates.

(3)     To a person which it has reason to believe--

(A)     intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or

(B)     intends to use the information for employment purposes; or

(C)    intends to use the information in connection with the underwriting of insurance involving the consumer; or

(D)    intends to use the information in connection with a determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status; or

. . . .

(F)    otherwise has a legitimate business need for the information--

    (i)    in connection with a business transaction that is initiated by the consumer; or

    (ii)    to review an account to determine whether the consumer continues to meet the terms of the account.

. . . .

15 U.S.C. § 1681b. "If an entity requests a report for a purpose not listed in the Act, an injured consumer can recover the 'actual damages' caused by negligent noncompliance, *see* 15 U.S.C. § 1681o(a)(1), or both actual and punitive damages caused by willful noncompliance, *see* 15 U.S.C. § 1681n." *Stergiopoulos & Ivelisse Castro v. First Midwest Bancorp, Inc.*, 427 F.3d 1043, 1046 (7th Cir. 2005). A party seeking to obtain a consumer report from a reporting agency need only have one permissible purpose. *Id*. at 1047.

Defendant contends that it is entitled to judgment as a matter of law on Count VI because Defendant did not conduct multiple credit inquiries and the

credit inquiries run by Defendant and third parties did not violate the FCRA because they were obtained with permissible purpose. ECF No. 73-1 at pp. 10-18. The Court agrees.

It is undisputed that Defendant obtained Plaintiff's consumer report on March 20, 2017. ECF No. 74-1 at p. 87. It is also undisputed that Ally Financial obtained Defendant's report on March 20, June 27, and July 6, 2017 in connection with financing for the Subaru. *Id.*[3] Furthermore, it is clear from the record that Plaintiff visited the dealership on March 20, 2017, to purchase and finance the Subaru. ECF No. 74 at ¶ 9. It is also clear from the record that Plaintiff completed two credit applications, one on March 20, 2017, and a second on June 15, 2017. ECF No. 74-1 at pp. 16, 20-21 & 30-31; ECF No. 75-1 at p. 47.

Because it is undisputed that Defendant and Ally Financial had a permissible purpose to obtain Plaintiff's consumer report on March 20, 2017, the only reports that Plaintiff asserts were obtained in connection with the Subaru purchase without a permissible purpose are those that were obtained by All Financial on June 27, 2017, and on July 6, 2017. Consequently, Plaintiff argues that Defendant is vicariously liable for Ally Financial's obtaining Plaintiff's consumer reports on those dates because Defendant's conduct was the "proximate cause, as well as a

_____

[3] The record also indicates that Citadel Banking obtained Plaintiff's consumer report on April 19, 2017, but it is unclear from Plaintiff's briefing how he can or would intend to show at trial that this consumer report was obtained in connection with the Subaru purchase. *Id.*

substantial factor in bringing about the harm to the Plaintiff." ECF No. 81 at pp. 14-18; ECF No. 27 at ¶ 107.

Plaintiff acknowledges that "the Third Circuit has not specifically addressed liability of a wrongdoer using a third party to violate the FCRA" but cites to several cases he argues show that "courts that have had the opportunity to specifically consider claims of liability under the FCRA for the actions of a third party have repeatedly determined that such claims are appropriate to advance the purposes of the [FCRA]." ECF No. 81 at p. 15. The Court finds none of these cases is applicable to the case at hand. In most of the cases cited to by Plaintiff, the Court found various defendants liable for FCRA violations because consumer reports were obtained by a bona fide agent of the defendant. In the case at hand, Plaintiff does not—likely because he cannot—argue that Ally Financial was an agent of Defendant. Instead, Plaintiff relies on a representative from Ally Financial stating that had Ally Financial not received credit applications from Defendant, it would not have conducted the credit inquiries in question to support this theory that Defendant proximately caused the FCRA violation. *Id.* at p. 16. The Court is not persuaded by Plaintiff's argument that Defendant may violate the FCRA through a non-agent. Plaintiff had ample time to join these third parties as defendants in this case but after failing to do so, he is now left with only one recourse: to ask the Court to hold Defendant liable for the third parties' alleged

wrongdoing. Plaintiff has failed to put forth—and the Court sees—no valid basis to do so.

Assuming *arguendo* though that Plaintiff could establish liability based on this flawed theory, the June 27 and July 6, 2017 credit inquiries were obtained with permissible purpose. Plaintiff initiated a credit transaction in which both he and Defendant contemplated that a third party would ultimately finance the transaction by accepting assignment of the contract. ECF No. 74-1 at pp. 20-21. Further, Plaintiff's credit application contemplated the nature of this transaction:

> You agree that we may obtain a consumer credit report periodically from one or more consumer reporting agencies (credit bureaus) in connection with the proposed transaction and *any update, renewal, refinancing, modification or extension of that transaction*.

*Id*. at pp. 55-57. Plaintiff testified that he expected Defendant to shop his application to several banks to find him a good deal. *Id*. at pp. 20-21. In order to fulfill its obligations by substantially performing under the contract, Defendant secured financing through a second bank when financing with the first bank fell through. Thus, the three consumer report inquiries were obtained with permissible purpose under the FCRA because Plaintiff granted permission for his consumer report to be obtained in connection with his purchase of the Subaru and the ongoing financing relationship arrangement thereafter. Defendant is entitled to judgment as a matter of law as to Plaintiff's FCRA claims, and Count VI will be accordingly dismissed.

## V.    Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment

(ECF No. 73) will be granted.  An appropriate Order follows.

DATED:  **April 3, 2020**                          BY THE COURT:

                                                    **/s/ Chad F. Kenney**
                                                    _____
                                                    CHAD F. KENNEY, J.